JONES, J.
dissenting:
I respectfully dissent from the majority’s holding that State Farm breached the policy when it offered to pay the cost to repair the vehicle on May 29, 2014. The Harmons disagreed with the amount State Farm offered to repair the vehicle, but instead of submitting the issue to the appraisal process, per the terms of the policy, they sued State Farm. Eventually, the appraisal process was initi *103 ated and the dispute was settled, albeit after the unnecessary delay caused by the Har-mons’ lawsuit.
It is important to contextualize this appeal. The Harmons’ insurance claim has been settled. They accepted $18,252.90, less the $500 deductible, as the cost of repair. Indeed, the majority admits that “State Farm has satisfied its contractual monetary obligation to the Harmons by paying for the cost of repair.” The Harmons cannot, at this point, reasonably argue that they are entitled to the actual cash value of the vehicle because they have already sold the vehicle.[1] This frivolous appeal is merely an attempt by the Harmons to squeeze State Farm for more money.
Unsurprisingly, the majority’s recitation of the facts is tailored to support its erroneous conclusion. Consequently, I feel obligated to recount the facts in an evenhanded manner. On December 22, 2013, State Farm received the Harmons’ initial claim. On January 21, 2014, the Harmons submitted two drastically different repair estimates, one for over $184,000 and the other for $18,491.36. Within the month, State Farm responded that it would consider the vehicle totaled; however, a few months later, State Farm indicated that it would pay the $18,491.36 estimate previously submitted by the Harmons. Three weeks later, the Harmons ended the cordial loss settlement negotiation process by initiating the underlying lawsuit. On July 21, 2014, State Farm filed an answer and a motion to stay the proceedings in order to initiate the appraisal process, as required by the policy. On August 12, 2014, the Harmons filed an objection to State Farm’s motion to stay. That same day, State Farm offered to pay the Harmons the actual cash value of the vehicle; essentially offering the Harmons an opportunity to end the controversy. The Har-mons rejected State Farm’s offer. On August 22, 2014, the parties stipulated to stay the proceedings and begin the appraisal process. The parties exchanged letters and agreed on the scope of the appraisal. On October 27, 2014, State Farm sent the Hannons a letter with two appraisals, one to repair the existing dash, and the other to replace the existing dash with a newly discovered part. On October 30, 2014, the Harmons acknowledged the receipt of State Farm’s letter, but did not indicate that they had decided as to how they would proceed. Finally, on November 10, 2014, the Harmons decided to have the dash repaired. State Farm tendered payment eleven days later.
Under the plain language of the insurance policy, State Farm had the choice to either repair the vehicle or pay the actual cash value of the vehicle.
1. We have the right to choose to settle with you or the owner of the covered vehicle in one of the following ways:
a. Pay the cost to repair the covered vehicle minus any applicable deductible.
(1) We have the right to choose one of the following to determine the cost to repair the covered vehicle:
(a) The cost agreed to by both the owner of the covered vehicle and us;
(b) A bid or repair estimate approved by its; or
(c) A repair estimate that is written based upon or adjusted to:
(i) The prevailing competitive price;
(ii) The paintless dent repair price that is competitive in the market; or
(ni) A combination of (i) and (ii) above.
[[Image here]]
b. Pay the actual cash value of the covered vehicle minus any applicable deductible. The damaged covered vehicle must be given to us in exchange for our payment, unless we agree that the owner may keep it. If the owner keeps the covered vehicle, then our payment will be reduced by the value of the covered vehicle after the loss; or
[[Image here]]
*104 If the owner of the covered vehicle or you fail to agree with us on the cost to repair the covered vehicle or the actual cash value of the covered vehicle, it shall be decided by an appraisal upon written demand by the owner of the covered vehicle, you, or us.
(Emphasis in original).
State Farm’s May 29, 2014 offer complied with subsection (l)(b) of the policy. As the foregoing demonstrates, if State Farm chose to repair the vehicle, it could do so by, inter alia, paying a bid or repair estimate approved by only State Farm. The estimate submitted by the Harmons provided a cost of repair of $18,491.36, which is precisely the amount State Farm offered in its May 29, 2014 letter. Per the terms of the policy, if the Harmons disagreed with the amount of the offer, they were required to submit the issue to the appraisal process. The Harmons ignored the policy and filed the underlying lawsuit.
As an aside, I disagree with the majority’s conclusion that the appraisal process was not required. The majority posits that the appraisal process was not triggered by State Farm’s May 29, 2014 offer because “At that point in time the parties had a dispute over State Farm’s interpretation of the policy, not the cost of repair.” This is plainly incorrect because the policy allows State Farm to make an offer to repair based on an approved estimate, which is what State Farm did in its May 29, 2014 letter. The Harmons did not disagree with State Farm’s interpretation of the policy, ie., the fact that State Farm made an offer to repair the vehicle; rather, the Harmons disagreed with the amount State Farm offered to repair the vehicle. This is precisely the situation that the appraisal process was designed to address: “If the owner of the covered vehicle or you fail to agree with us on the cost to repair ... it shall be decided by an appraisal.,..” (Emphasis in original). Surely, the majority’s conclusion that the appraisal process was not required is an attempt to rationalize the Harmons’ unreasonable lawsuit.
The majority concludes that on May 29, 2014, State Farm breached the policy by unreasonably offering $18,491.36 instead of the actual cash value of the vehicle. I am baffled by this conclusion for two reasons. First, the policy clearly states that State Farm may repair the vehicle by paying a repair estimate approved by only State Farm. State Farm complied with the policy by offering to pay $18,491.36 to repair the vehicle. Second, the majority’s conclusion that State Farm breached the policy by failing to offer the actual cash value of the vehicle is plainly incompatible with its ac-knowledgement that “[i]t is undisputed that State Farm again offered to pay the Har-mons what it estimated to be the actual cash value of the motorhome while the motion to stay proceedings was pending.” I concede that State Farm offered the Harmons the actual cash value of the vehicle late in the process, but both parties caused delays and the policy does not impose specific time constraints. Moreover, delays should be expected in loss settlement negotiations; especially in this ease given that the replacement dash was no longer manufactured. Nonetheless, the majority takes issue with State Farm’s delay, but overlooks similar delays by the Harmons.
A possible explanation for the majority’s erroneous conclusion is that it inteipi’eted Alaska’s reasonable expectations doctrine as a license to disregard the plain language of the policy and rule in favor of the sympathetic insureds. As mentioned by the majority, Alaska’s reasonable expectations doctrine instructs us to honor the Harmons’ “objectively reasonable expectations ... even though painstaking study of the policy would negate those expectations.” Devine v. Great Divide Ins. Co., 350 P.3d 782, 786 (Alaska 2015) reh’g denied, 350 P.3d 782 (Alaska 2015). The majority emphasized the foregoing, and seemingly glanced over the subsequent instruction, which provides: “To determine the parties’ reasonable expectations, we examine (1) the language of the disputed policy provisions; (2) the language of other provisions in the same policy; (3) extrinsic evidence; and (4) case law interpreting similar provisions.” Id. (Emphasis added). The language of the policy cannot simply be disregarded. Indeed, in two cases cited by the majority, the Alaska Supreme Court ana *105 lyzed the language of the respective policies and ruled in favor of each insurance company, despite the alleged expectations of each insured. See, Devine, 350 P.3d 782 (Alaska 2015); Stordahl v. Government Emp. Ins. Co., 564 P.2d 63 (Alaska 1977). Here, the policy’s language is simple and straightforward: State Farm may repair the vehicle by paying “[a] bid or repair estimate approved by [State Farm].” No painstaking study is necessary to understand State Farm’s responsibility, nor is a painstaking analysis necessary to conclude that State Farm fulfilled its responsibility.
The bottom line is that State Farm’s May 29, 2014 letter did not amount to a breach of the policy; rather, it was a loss settlement offer in response to two drastically different repair estimates submitted by the Harmons. Based on my experience, which includes over thirty years of practicing insurance law, insureds and insurers generally exchange a series of demands and offers in loss settlement negotiations. State Farm’s May 29, 2014 offer complied with the policy, but understandably, the Harmons expected more. The appropriate response by the Harmons would have been to make a counter offer, or refuse State Farm’s offer and initiate the appraisal process. Indeed, the appraisal process led to the eventual settlement, which could have been reached sooner, but for the Harmons’ eagerness to file the underlying lawsuit.

. The policy provides that if State Farm were to pay the Harmons the actual cash value of the vehicle, "The damaged covered vehicle must be given to [State Farm] in exchange for [State Farm's] payment....” (Emphasis in original).